UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------x

**ALBA QUIÑONEZ FLORES,**

                      **Plaintiff,**

   **v.**

**UNITED STATES OF AMERICA;**
**DOES 1-10**

                      **Defendants.**

-------------------------------------------------------x

**PLAINTIFF'S MEMORANDUM OF
LAW IN OPPOSITION TO
DEFENDANT'S MOTION TO CHANGE
VENUE**

**Civil Action No. 14-CV-3166 (JBW) (RML)**

**Hearing Date: March 3, 2015 at 10:00am**

Plaintiff Alba Quiñonez Flores ("Ms. Quiñonez" or "Plaintiff") hereby files this Memorandum of Law in Opposition to Defendant United States of America's ("Defendant") Motion to Change Venue.  Ms. Quiñonez has filed this action against the United States pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, and against currently unidentified Customs and Border Patrol ("CBP") agents in their individual capacities for violations of her rights under the Fifth Amendment to the United States Constitution in accordance with *Bivens v. Six Unknown Defendants of Federal Bureau of Narcotics*, 403 U.S. 388 (1971) ("*Bivens*").  The basis of Ms. Quiñonez's claims is the mistreatment she suffered while in CBP custody during her immigration detention in Texas.  In its Motion to Change Venue, Defendant incorrectly asserts that venue is improper under 28 U.S.C. § 1391(e)(C)(1) based on the mistaken belief that Ms. Quiñonez cannot establish venue based on where she resides.  *See* Electronic Case File ("ECF") No. 20-1, Defendant's Memorandum of Law in Support of Its Motion to Change Venue Pursuant to 28 U.S.C. § 1404(a).  Defendant also incorrectly argues that the Eastern District of New York

("EDNY") is an inconvenient forum and that this case should consequently be transferred to the District Court for the Southern District of Texas pursuant to 28 U.S.C. § 1404(a).  *See id.*

## BACKGROUND

Ms. Quiñonez was apprehended by CBP agents on February 19, 2013 in the desert near Falfurrias, Texas.  *See* ECF No. 21-1, Kolbe Decl., Exhibit A; ECF No. 12, Second Amended Compl., p. 6.  Upon taking her into custody, CBP agents informed Ms. Quiñonez that they were taking her to the *hieleras*, which is Spanish for "freezers," a term which aptly describes the frigid temperatures in the temporary holding rooms in which CBP detains aliens near the U.S.-Mexico border in Texas.  *See* ECF No. 12, pp. 1, 6.  CBP agents transferred Ms. Quiñonez to the CBP Falfurrias Station located at 933 County Road 300, Falfurrias, Texas.  *See* ECF No. 21-1, Exhibit A; ECF No. 12, p. 15.

Ms. Quiñonez suffers from diabetes, hypertension, cardiac problems, depression, anxiety, and migraines.  *See* ECF No. 12, p. 7.  When she was apprehended by CBP, Ms. Quiñonez was carrying various medications to treat these ailments, including Co-Aprovel and Enapril for her hypertension; Fluoxetine, Trazodone, and Clonazepam for depression and anxiety; Tramadol for migraines; and Glibenclamide, insulin, and syringes for diabetes.  *Id.*

Upon her arrival at the Falfurrias Station, a CBP agent confiscated all of Ms. Quiñonez's medications and discarded them, except the Enapril, which was nonetheless made inaccessible to her.  *See* ECF No. 12, p. 7. CBP never provided Ms. Quiñonez with any replacement medications.  *Id.*  She also informed a CBP officer that she was dizzy and was experiencing pain from a sprained ankle, but her complaints were ignored and she received no immediate medical attention.  *Id.* at 7-8.

After being processed, Ms. Quiñonez was put in a small, overcrowded cell that was so cold that her fingers turned blue and her lips split.  *See* ECF No. 12 at pp. 7-8.  There was absolutely no privacy in the cell and male CBP officers and detainees could easily see Ms. Quiñonez use the only toilet in the cell, for which there was never an adequate supply of toilet paper.  *Id.* at 8-9.  All of the women detained together were forced to share a single container of drinking water that smelled foul and tasted like bleach.  *Id.* at 9.  Ms. Quiñonez also began menstruating while in CBP custody, which was a serious problem because CBP agents would only provide a total of 4-5 sanitary napkins for roughly twenty women each day.  *Id.*  Ms. Quiñonez was only able to obtain a single napkin, which was insufficient and her clothing became soaked in blood after she desperately tried to improvise by using toilet paper.  *Id.* at 9-10.  CBP never provided a change of clothes or basic hygiene products.  *Id.* at 10; *see* ECF 16, Defendant's Answer to the Second Amended Complaint, at ¶29, admitting no change of clothes provided  Additionally, due to her sprained ankle, dehydration, and a severe migraine (for which she no longer had medication), Ms. Quiñonez had difficulty getting to the food distribution line. *See* ECF No. 12, at p. 10. And because CBP agents would not let another detainee retrieve food for Ms. Quiñonez, she was often forced to miss meals.  *Id.* at 10-11.

As a result of dehydration and malnourishment which exacerbated her pre-existing and untreated medical conditions, Ms. Quiñonez lost consciousness and collapsed in the cell.  *See* ECF No. 12, p. 11.  Other detainees had previously warned CBP agents about Ms. Quiñonez's deteriorating health, but the agents never took any action to investigate her condition or provide her with medical treatment.  *Id.* Only after her collapse did CBP agents finally take Ms. Quiñonez to Edinburg Regional Medical Center.  *See id.*; ECF No. 18-1, <u>Exhibit A</u>, p. A0222. After her brief hospitalization during which she received no treatment, Ms. Quiñonez was

returned to the Falfurrias Station the same day and remained in CBP custody. *See* ECF No. 12 at 12-13. At no point during her time in detention did Ms. Quiñonez ever receive any of her prescribed medications or appropriate medical attention.

In addition to neglecting Ms. Quiñonez's serious medical needs, CBP agents also failed to provide for her basic human needs while in detention and further failed to properly maintain the detention facility in a clean and hygienic manner. Bright overhead lights in the cell were kept on 24 hours a day and Ms. Quiñonez was never given any form of bedding. *See* ECF No. 12, p. 9; *See* ECF No. 16 at ¶3(d) (admitting lack of bedding and lights remaining on during detention). Consequently, she was forced to sleep on a cold, hard floor with the lights on every night. *Id.* Ms. Quiñonez and the other detainees were also never provided with basic hygiene products, such as soap, toothbrushes, or toothpaste, nor were they ever permitted to bathe, despite being detained for multiple days. *Id.* at 10, *see* ECF 16 at ¶¶ 29-30 (admitting lack of bathing facilities and failure to provide toothpaste and toothbrushes). Moreover, the cell was never properly cleaned and did not contain a trash can, so that used toilet paper and sanitary napkins piled up next to the toilet, causing a putrid stench to permeate throughout the entire cell. *See* ECF No. 12, p. 10. The food provided to Ms. Quiñonez was always partially frozen and consisted of a processed meat sandwich on white bread. *Id.*

As a result of the mistreatment that Ms. Quiñonez suffered during her detention, she filed this action against Defendant and currently unidentified CBP agents pursuant to the FTCA and *Bivens*, respectively. Defendant filed its Answer to the Complaint on November 25, 2014. *See* ECF No. 16. On December 30, 2014, Defendant filed a Motion to Change Venue in which it asserts that Ms. Quiñonez cannot establish proper venue in the EDNY based on her residence

under 28 U.S.C. §1391(e)(1)(C), and that this case should be transferred pursuant to § 1404(a) because the EDNY is an inconvenient forum.

## ARGUMENT[1]

I.   **Venue Is Proper in the Eastern District of New York Based on Ms. Quiñonez's Residence.**

A.   **Venue Is Proper Based on the Plain Meaning of 28 U.S.C. § 1391.**

Defendant incorrectly asserts that Ms. Quiñonez cannot establish proper venue based on her residence because she is not lawfully present in the United States.  *See* ECF No. 20-1, p. 4. As explained in Ms. Quiñonez's Memorandum in Support of her Motion to Strike, *see* ECF No. 18, pp. 7-8, she is lawfully present in the United States because she has a pending application for asylum.  According to the official policy of United States Citizenship and Immigration Services ("USCIS"), an "alien, whose bona fide application for asylum is pending, is in an authorized period of stay and does not accrue unlawful presence for purposes of section 212(a)(9)(B) of the [Immigration and Nationality] Act . . . ." Donald Neufeld, USCIS Acting Assoc. Director, *Consolidation of Guidance Concerning Unlawful Presence for Purposes of Sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act*, p. 29, May 6, 2009, *available at* http://www.uscis.gov/sites/default/files/USCIS/Laws/Memoranda/Static_Files_Memoranda/2009 /revision_redesign_AFM.PDF.  Thus, as an asylum applicant, Ms. Quiñonez is authorized to be in the United States and is lawfully present here.

Ms. Quiñonez has established proper venue in the EDNY based on her residence under the plain meaning of 28 U.S.C. § 1391(e).  Under §1391(e)(1)(C), a plaintiff can bring an action against federal officials acting in their official capacity, a federal agency, or the United States

---

[1] While many of the arguments contained in this section have already been made in Plaintiff's Motion to Strike, they are repeated here in order to thoroughly and directly respond to all of Defendant's assertions in its Motion to Change Venue.  *See* ECF No. 18, pp. 7-18.

where "the plaintiff resides if no real property is involved in the action." For the purpose of determining proper venue, "a natural person, including an alien lawfully admitted for permanent residence in the United States, shall be deemed to reside in the judicial district in which the person is domiciled." §1391(c)(1). The provision does not exclude any class of persons, based on alienage or otherwise, from establishing residency for venue purposes. As explained below, interpreting the statute to discriminate against certain groups of aliens residing in the United States would raise serious equal protection issues. But the Court does not need to address such potential constitutional issues because the plain meaning of §1391 does not exclude any person from establishing proper venue based on her residency. *See Zadvydas v. Davis*, 533 U.S. 678, 689 (2001) ("[I]t is a cardinal principle of statutory interpretation . . . that when an Act of Congress raises a serious doubt as to its constitutionality, this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.") (internal quotations omitted). Under the plain meaning of the general venue statute taken as a whole, Ms. Quiñonez has established proper venue in the EDNY pursuant to § 1391(e)(1)(C) because she resides in the EDNY. *See Nwozuzu v. Holder*, 726 F.3d 323, 327 (2d Cir. 2013) ("When interpreting a statutory provision, we begin with the language of the statute. If the statutory terms are unambiguous, we construe the statute according to the plain meaning of its words.") (internal citations omitted); *Mohammed v. Palestinian Auth.*, 566 U.S. ___, 132 S.Ct. 1702, 1709 (2012) ("[R]eliance on legislative history is unnecessary in light of the statute's unambiguous language.") (internal citations omitted); *INS v. Phinpathya*, 464 U.S. 183, 189 (1984).

Defendant cites out-of-circuit cases to support its position that an alien cannot establish proper venue based on her residence, *see* ECF No. 20-1, pp. 5-6, but those cases are ultimately unpersuasive because the authority on which they are based does not unconditionally state that

aliens are prohibited from establishing venue based on their place of residence.  Indeed, one of

the cases Defendant cites holds that the plain text of the venue statute permits aliens to establish

venue based on their place of residence:

> [T]he plain language of Section 1391(e)(3) allows a plaintiff to sue an officer of
> the United States in the district where the Plaintiff resides (if no real property is
> involved in the action).  It is unambiguous, and interpreting it to apply equally to
> all plaintiffs does not lead to absurd results.  No further analysis is necessary to
> determine the applicability of Section 1391(e)(3) in this case.

*Gu v. Napolitano*, No. 09-cv-2179, 2009 WL 2969460, at *1 (N.D. Cal. Sept. 11, 2009).  *See
also Kumar v. Mayorkas*, No. 12-cv-6470, 2013 WL 5313718, at *4 (N.D. Cal. Sept. 23, 2013)
(agreeing with *Gu* and holding that an asylee can establish venue based on his residency pursuant
to §1391(e)(3)).  *Gu* and *Kumar* correctly interpreted § 1391(e)(1)(C) based on the venue
statute's plain language. *See Desert Palace Inc. v. Costa*, 539 U.S. 90, 98 (2003) ("[W]here, as
here, the words of the statute are unambiguous, the judicial inquiry is complete.") (internal
quotation omitted).

Furthermore, all of the cases Defendant cites in support of its position ultimately glean
their rationale from a nineteenth century U.S. Supreme Court decision (also cited by Defendant,
*see* ECF No. 20-1, p. 6) that <u>does not</u> categorically deny aliens from establishing residence for
venue purposes.[2] *See Galveston*, *H & S.A. Ry. Co. v. Gonzales*, 151 U.S. 496 (1894).  The Court
in *Galveston* stated, "An alien, however, is *assumed* not to reside in the United States, and hence
must resort to the domicile of the defendant."  *Id.* at 506-07 (emphasis added).  At most,
*Galveston* established a presumption that an alien who files a lawsuit does not reside in the
United States, but nothing in *Galveston* suggests that the presumption cannot be rebutted.  Here,

---

[2] *See* ECF No. 20-1, pp. 5-6; *Ou v. Chertoff*, No. 07-cv-3676, 2008 WL 686869, at *1 (N.D. Cal. Mar. 12, 2008); *Li v. Chertoff*, No. 08-cv-3540, 2008 WL 4962992, at *1 (N.D. Cal. Nov. 19, 2008); *Zhang v. Chertoff*, No. 08-cv-02589, 2008 WL 5271995, at *3 (N.D. Cal. Dec. 15, 2008) (citing *Ou* and *Li*); *Arevalo-Franco v. INS*, 889 F.2d 589, 590 (5th Cir. 1989); *Williams v. United States*, 704 F.2d 1222, 1225 (11th Cir. 1983).

7

Ms. Quiñonez's domicile in New York rebuts any presumption that she does not reside in the United States. *See* ECF No. 21-2, <u>Exhibit E</u>, Order of Supervision, p. A0213 (listing Ms. Quiñonez's address as being in Queens, New York).

Ms. Quiñonez has demonstrated that she is deemed to reside in New York under both the Immigration and Nationality Act ("INA") and New York state law. *See* ECF No. 18, pp. 9-10. Under the various statutory definitions of residency and domicile in New York, the two key factors are generally physical presence and an intent to remain or return. *See id.*; N.Y. Tax Law §605(b)(1)(A); N.Y. Elec. Law §1-104; N.Y. Surr. Ct. Proc. Act Law § 103. Several state courts in New York have held that a person's immigration status has no bearing on that person's ability to establish domicile or residency in New York. In *Matter of Guardianship of Lafontant*, a surrogate's court determined that an alien was a domiciliary of New York and that the "petitioner's status as an illegal alien is immaterial to the issue of his domicile. . . ." 161 Misc. 2d 840, 841, 617 N.Y.S.2d 292, 293 (N.Y. Sur. Ct. 1994). In support of its reasoning, that court noted that the petitioner, like Ms. Quiñonez, had "taken legal steps to remain in the United States." *Id.; see also 1504 Associates, L.P. v. Wescott*, 41 Misc. 3d 6, 10, 972 N.Y.S. 2d 809, 812 (N.Y. Sup. Ct. App. Term 2013) (a person in the United States illegally may have a primary residence in New York for rent regulation purposes); *Catalanotto v. Palazzolo*, 46 Misc. 2d 381, 385, 259 N.Y.S. 2d 473, 477 (N.Y. Sup. Ct. 1965) (person in the United States illegally is a resident of New York within the meaning of the state's Insurance Law).[3] The foregoing cases all involved aliens without authorization to be in the United States; Ms. Quiñonez has an even

---

[3] The New York Court of Appeals has held that an alien present in the United States pursuant to a B-2 visitor visa cannot establish a primary residence in New York because such visitors are required to have a "principal, actual dwelling place" outside the United States. *Katz Park Ave. Corp. v. Jagger*, 898 N.E.2d 17, 18-19 (N.Y. Ct. App. 2008). *See also* 8 U.S.C. § 1101(a)(15)(B). That decision is inapposite to this case, however, because while B-2 visa holders can only be legally admitted to the United States on a temporary basis, an alien such as Ms. Quiñonez seeking asylum necessarily intends to remain permanently in the United States.

stronger claim to domicile and residency in New York because she is authorized to be in the United States based on her pending asylum application. And New York's definition of domicile is critical because, according to the U.S. Supreme Court, the issue of domicile of an alien in a state is "a question to be decided by the State." *See Elkins v. Moreno*, 435 U.S. 647, 666 (1978).

Defendant erroneously claims that Ms. Quiñonez's presence in the United States is only temporary and cannot be used to establish domicile for venue purposes. *See* ECF No. 20-1, pp. 6-7. However, the issue of Ms. Quiñonez's domicile is not for Defendant to determine. *See Elkins*, 435 U.S. at 666. The Second Circuit Court of Appeals has expressly stated that "lawful domicile" in the United States does not require permanent resident status. *Lok v. INS*, 681 F.2d 107, 108 (2d Cir. 1982). An alien can establish lawful domicile when she establishes an intent to remain in the United States and her intent to remain is "legal under the immigration laws." *Id.* at 109. An alien does not have to be a lawful permanent resident in order to possess a "lawful intent to remain." *Id.* (citing *Elkins*, 435 U.S. at 665-68). Ms. Quiñonez has filed a bona fide application for asylum pursuant to the INA and procedures established by federal regulations. Accordingly, her intent to remain in the United States is "legal under the immigration laws" and there is nothing that prevents her from establishing "lawful domicile" in the EDNY. As such, venue is proper in the EDNY pursuant 28 U.S.C. § 1391(e)(1)(C), based on Ms. Quiñonez's residence.

**B.  Denying Venue Based on Ms. Quiñonez's Residence Would Violate the Fifth Amendment.**

Applying 28 U.S.C. §1391(e) in a discriminatory fashion to deny venue based on residence to Ms. Quiñonez would violate her right to equal protection under the Due Process Clause of the Fifth Amendment to the United States Constitution. All aliens present in the United States, regardless of their status, are entitled to due process and equal protection under the

9

Fifth Amendment.  *See Plyler v. Doe*, 457 U.S. 202, 211-12 (1982); *Matthews v. Diaz*, 426 U.S. 67, 77 (1976).  When the federal government draws distinctions between people based on alienage, the distinction must be "rationally related to a legitimate government interest" to satisfy the requirements of equal protection.  *U.S. v. Lue*, 134 F.3d 79, 86-87 (2d Cir. 1998). Furthermore, classifications that differentiate between lawful permanent residents ("LPR") and other aliens are subject to "the ambit of judicial suspicion."  *Adusumelli v. Steiner*, 740 F. Supp. 2d 582, 595 (S.D.N.Y. 2010).  "Rational basis review is satisfied where 'there is a plausible policy reason for the classification, the legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decisionmaker, and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational.'"  *Collier v. Barnhart*, 473 F.3d 444, 449 (2d Cir. 2007) (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 11-12 (1992).

   Applying §1391(e)(1)(C) in such a way as to allow U.S. citizens and LPRs to establish venue based on their residence, but denying the same statutory right to other groups of aliens who lawfully reside in the United States, could not be rationally related to any legitimate government purpose and would violate equal protection.  *See Ibrahim v. Chertoff*, No. 06-cv-2071, 2007 WL 1558521, at *4 n. 3 (S.D. Cal. 2007) ("[T]he distinction between resident aliens and nonresident aliens [in §1391] raises due process and equal protection concerns."); *cf. Alegria v. United States*, 945 F.2d 1523, 1528 (11th Cir. 1991) ("Simply stated, we find no rational basis for treating [resident or non-resident] aliens and citizens differently for venue purposes in the context" of jeopardy tax assessments.).  The legislative purpose of enacting §1391(e) was to "provide nationwide venue for the convenience of individual plaintiffs" for actions against federal officials, federal agencies, or the federal government.  *Stafford v. Briggs*, 444 U.S. 527,

10

542 (1980).  Prior to enactment, such actions could only be brought in the District Court for the District of Columbia.  *Id.* at 539-540.  Likewise, the purpose of 28 U.S.C. § 1402, which provides proper venue for suits in which the United States is a defendant, is "to protect the plaintiff from abuse by the United States' forcing the plaintiff to litigate the controversy in an inconvenient forum . . . ."  *Jones v. United States*, 407 F. Supp. 873, 876 (N.D. Tex. 1976).

Because the only purpose of allowing plaintiffs to sue the United States in the district of their own residence is for the convenience of plaintiffs, there is no rational reason to discriminate against lawfully present aliens who are not LPRs in applying the venue statute.  Forcing aliens authorized to be in the United States with lawful domicile, who are not LPRs, to litigate in a faraway and wholly inconvenient forum would be irrationally discriminatory.  There is no legitimate government purpose in arbitrarily foreclosing such aliens from establishing venue based on their residence.  Moreover, the fact that Ms. Quiñonez is not a "green card" holder does not mean that she does not have "lawful domicile" in this district.  *See Lok*, 681 F.2d at 108; *Nwozuzu v. Holder*, 726 F.3d at 328 (The definition of "reside permanently" in the United States "requires something less than a lawful admission of permanent residency.")  Thus, there is simply no legitimate government purpose that could possibly be accomplished by denying an asylum applicant lawfully residing in the United States the ability to fully avail herself of the venue statue.  The only effect of such action in this case would be to create an unjustified and altogether pointless burden for Ms. Quiñonez to litigate her claim in federal court.  Accordingly, placing her in a separate class of persons for venue purposes would be arbitrary, irrational, and unconstitutional.

## II.   This Case Should Not Be Transferred Because the Eastern District of New York Is a Convenient Forum.

Defendant asserts that the EDNY is an inconvenient forum and that pursuant to 28 U.S.C. §1404(a), this case should be transferred to the District Court for the Southern District of Texas based on events and third-party witnesses being located in Texas.  *See* ECF No. 20-1, p. 7. Section 1404(a) provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."  However, "[i]n any motion to change venue, the movant bears the burden of establishing the propriety of transfer by clear and convincing evidence." *Payless Shoesource, Inc. v. Avalon Funding Corp.*, 666 F. Supp. 2d 356, 362 (E.D.N.Y. 2009); *see also Pecorino v. Vutec Corp.*, 934 F. Supp. 2d 422, 444 (E.D.N.Y. 2012) ("The burden of demonstrating the desirability of transfer lies with the moving party, and the burden is a heavy one.") (citation omitted); *Laumann Mfg. Corp. v. Castings USA, Inc.*, 913 F. Supp. 712, 721 (E.D.N.Y. 1996) ("The plaintiff's choice of forum should only be disturbed if that choice is completely and utterly outweighed by the severe inconvenience of the defendant.")  Thus, Defendant must affirmatively establish the propriety of the proposed transfer.  *Merkur v. Wyndham Int'l Inc.,* 2001 WL 477268, at *1 (E.D.N.Y. March 30, 2001) (The moving party bears the burden of clearly establishing that a transfer is appropriate and that the motion should be granted.)

Defendant has listed ten factors that courts consider to determine the propriety of transfer under §1404(a): "(1) convenience of the parties; (2) convenience of witness; (3) relative means of the parties; (4) locus of operative facts and relative ease of access to sources of proof; (5) attendance of witnesses; (6) the weight accorded to the plaintiff's choice of forum; (7) calendar congestion; (8) the desirability of having the case tried by the forum familiar with the substantive

12

law to be applied; (9) practical difficulties; and (10) how best to serve the interest of justice, based on an assessment of the totality of material circumstances." ECF No. 20-1, p. 8, *quoting Neil Bros. Ltd v. World Wide Lanes, Inc.*, 425 F. Supp. 2d 325, 327-28 (E.D.N.Y. 2006). Contrary to Defendant's assertions, comprehensive consideration of all of these factors reveals that Defendant has failed to meet the heavy burden required to establish that this action should be transferred.  In fact, an evaluation of the above-listed factors clearly demonstrates that transfer is not warranted and that this Court should retain jurisdiction over this action.

A.    **Convenience of the Parties**

Defendant notably does not address the relative convenience of the parties in its Motion and, in fact, litigating this action in the EDNY does not place any significant inconvenience on Defendant. *See Jones v. United States*, No. 02-cv-1017-JG, 2002 WL 2003191, at *3 ("[T]he United States is able to litigate in any district.")   And even taking into account any minor inconvenience Defendant would face litigating in the EDNY, when balancing the convenience of the parties, "a transfer of venue should not merely shift the burden of inconvenience from one party to the other." *Invivo Research, Inc. v. Magnetic Resonance Equip. Corp.*, 119 F. Supp. 2d 433, 438 (S.D.N.Y. 2000).  Transferring this case to Texas would only serve the purpose of improperly shifting the inconvenience from Defendant, the United States of America, to Ms. Quiñonez, an individual of very modest means. Ms. Quiñonez would be heavily and unduly burdened by having to litigate this case in Texas based on her serious health problems and very limited financial means. Ms. Quiñonez suffers from, and is under treatment for, diabetes, hypertension, cardiac problems, migraines, depression, and anxiety disorder. She recently suffered a condition which is causing her difficulty in walking and her diabetes is currently uncontrolled, such that she must be monitored in a clinic on a weekly basis.  Moreover, Ms.

Quiñonez is currently four months pregnant and her pregnancy is considered "high risk" due to her various medical problems. These health issues would make repeated trips between New York and Texas extremely demanding and onerous for Ms. Quiñonez.  *See NGC Worldwide, Inc. v. Siamon*, No. 3:02CV1760 (JBA), 2003 WL 1987001, at *2 (D. Conn. Apr. 21, 2003) ("The health concerns of a party or witness can be an important factor in the determination of whether a § 1404(a) transfer is proper.")

### B.    Convenience of the Witnesses

The location of non-party witnesses is an important factor to consider in ruling on a §1404(a) motion.  *See Romano v. Banc of Am. Insurances Servs.*, 528 F. Supp. 2d 127, 131 (E.D.N.Y. 2007). This factor also weighs against transfer because the vast majority of Defendant's potential non-party witnesses would be either paid experts or employees of the United States, who are entitled to very little deference regarding any potential inconvenience. *See Carr v. Ensco Offshore Co.*, No. 06-cv-629, 2007 WL 760367, at *2 (S.D. Tex. Mar. 8, 2007) ("Generally, the Court gives very little consideration to the convenience of witnesses who are still employed by Defendant."); *Bullard v. Burlington N. Santa Fe Ry. Co.*, No. 07-cv-6883, 2008 WL 4104355, at *4 (N.D. Ill. Aug. 29, 2008) ("Courts are less concerned about the burden that appearing at trial might impose on witnesses who are either employees of parties or paid experts; it is presumed that such witnesses will appear voluntarily.").  Moreover, if any potential non-party witness (such as any employee of Edinburgh Regional Medical Center) is unable to travel to New York, videotaped deposition testimony would be an adequate substitute for live testimony.  *See Lesser ex rel. Lesser v. Camp Wildwood*, No. 01 CIV. 4209 (RWS), 2002 WL 1792039, at *4 (S.D.N.Y. Aug. 2, 2002) ("Where deposition testimony is an available alternative to live testimony, the convenience of the non-party witness does not favor a transfer.").

14

Additionally, all of the physicians who have been treating Ms. Quiñonez since her release from detention all reside in New York and are likely to provide testimony.

### C.  Relative Means of the Parties

Defendant states that this factor is presently neutral because it is currently unaware of Ms. Quiñonez's means.  *See* ECF No. 20-1, p. 10.  However, her meager financial means as compared to the United States strongly weighs against transferring the case to a distant district. When deciding whether to transfer venue, the relative means of the parties "is important[,] primarily when a disparity exists between the[m]." *Advance Relocation & Storage, Inc. v. Wheaton Van Lines, Inc*., No. CV-99-2491, 2000 WL 33155640, at *8 (Sept. 15, 2000 E.D.N.Y). In this instance, an apparent disparity exists where Ms. Quiñonez, an asylum seeker, is represented by a non-profit legal services organization and pro bono counsel because she is otherwise unable to afford legal representation and has orders of magnitude fewer resources than the United States. *See Jones v. United States.*, No. 02-cv-1017, 2002 WL 2003191, at *3, (Aug. 26, 2002 E.D.N.Y) (Presuming that FTCA and *Bivens* plaintiff had modest means compared to U.S. government without the need for documentation from plaintiff).  Having to litigate this action in Texas would place a substantial burden on Ms. Quiñonez who is currently not employed, is not yet authorized to work, and is living with relatives due to her financial circumstances.  It would be incredibly difficult, if not impossible, for Ms. Quiñonez to muster the funds needed to repeatedly travel between New York and Texas. As compared to Ms. Quiñonez, Defendant has substantially greater means to defend this action in the EDNY or any other venue.  Accordingly, this factor weighs very heavily against transfer considering the massive disparity in resources between Defendant and Ms. Quiñonez.

### D.    Locus of Operative Facts and Ease of Access to Sources of Proof

While many of the events giving rise to Ms. Quiñonez's claim did occur in Texas, this single factor does not satisfy Defendant's heavy burden of demonstrating that this case should be transferred.  Additional events relevant to the case occurred in venues outside of Texas, namely, her continued medical issues while detained in Florida, and most importantly her continued medical treatment in New York after her release from detention.  And in determining whether a transfer is appropriate, the Court weighs all of the various factors collectively to make a comprehensive assessment. The fact that the detention facilities where Ms. Quiñonez was subjected to gross mistreatment are located in Texas does not, by itself, warrant transfer.

Moreover, the ease of access to sources of proof does not weigh in favor of transfer because the majority of the relevant physical evidence at issue in this case will be documentary. Any potential documents needed by either party can easily be converted to electronic form, if they have not been already.  *See Timberland Machines, and Irrigation*, *Inc. v. Echo, Inc*., 2009 WL 996044, *5 (D. Conn. 2009) ("[T]he court finds that the location of the relevant documents is a non-issue in today's world because copy machines and electronic based discovery make it much easier to obtain documents at a distance."); *Illinois Nat. Ins. Co. v. Banc One Acceptance Corp*., 2008 WL 5423262, *7 (N.D.N.Y. 2008) ("The location of relevant documents is largely a neutral factor in today's world of faxing, scanning, and emailing documents.").

Furthermore, the volume of documents, some of which have already been exchanged by the parties, is not expected to be substantial due to the straightforward nature of the claims which rely more heavily on testimony.  Moreover, many of the documents in Defendant's possession are likely maintained in digital databases accessible from multiple and remote locations.

### E.     Attendance of Witnesses

While Defendant is correct that hospital employees of Edinburgh Regional Medical Center ("Edinburgh") may be potential third-party witnesses, (*see* ECF. No. 20-1, p. 11) in the event that any of these potential witnesses would be unwilling to travel to New York to testify, "this factor does not weigh in favor of transfer in light of the option of videotaping testimony of witnesses unwilling to travel." *Citibank, N.A. v. Affinity Processing Corp.*, 248 F. Supp. 2d 172, 178 (E.D.N.Y. 2003). There would no reason to doubt the veracity of the testimony of the Edinburgh employees, who have no interest in the outcome of this case. Accordingly, videotaped deposition testimony would be just as reliable as live testimony.

Any other witnesses for Defendant will either be individual defendants themselves or employees of the United States. Even if employee witnesses become unwilling to testify[4], their attendance can be compelled by virtue of their relationship to the United States as their employer. *See Pecorino*, 934 F. Supp. 2d at 442 ("[E]mployee witnesses are subject to compulsory process in either forum by virtue of their employment relationship with a party"); *Fuji Photo Film Co. v. Lexar Media, Inc.*, 415 F. Supp. 2d 370, 375 (S.D.N.Y. 2006) ("Because parties can compel the testimony of their own employees without the need for subpoena . . . this factor has no impact on the analysis."); *Advanced Fiber Techs. Trust v. J & L Fiber Servs., Inc.,* No. 07-cv-1191, 2008 WL 4890377, at *4 (N.D.N.Y. Nov. 12, 2008) ("[A]ny employees of a party, despite their geographic location, can reasonably be expected to testify as witnesses at trial and their availability is not a consideration here").

---

[4] Defendant submits various affidavits from officers/employees of CBP (see ECF No. 21, <u>Exhibits I-O</u>). However, these employees are unlikely to have relevant testimony or testify at trial as the case turns on *conditions of detention* and not on the legality of the threshold decision detain Ms. Quiñonez. The affidavits relate to Defendant's employees who initially detained and processed Ms. Quiñonez, and do not address those yet unidentified officers who subjected Ms. Quinonez to harsh and unconstitutional conditions.

### F.      Plaintiff's Choice of Forum

Defendant states that Ms. Quiñonez "should not be permitted to choose her forum based on her 'residence'" and that "very little weight should be accorded to Plaintiff's choice of fourm."  ECF No. 20-1, p. 11. Quite the opposite is true: "A plaintiff's choice of forum is generally entitled to considerable weight and should not be disturbed unless other factors weigh strongly in favor of transfer."  *Neil Bros.* 425 F. Supp. 2d at 333; *see also Iragorri v. United Techs. Corp.,* 274 F.3d 65, 70 (2d Cir.2001) (" '[U]nless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed.' ") (quoting *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508 (1947)).  Moreover, Ms. Quiñonez has clearly established (in Part I above) that she is fully entitled to choose the EDNY as the venue for this action based on her residence.   The fact that her residence is in the EDNY requires that heightened deference be given to her choice of forum.  *See Tawil v. Target Corp.*, 2010 WL 2719831, at *2 (E.D.N.Y. July  8,  2010) ("[P]laintiffs' primary residence is  in New York and,  accordingly, their choice of forum should be given great weight.").

### G.      Calendar Congestion

Ms. Quiñonez agrees with Defendant that this factor is likely neutral.  *See* ECF No. 20-1, p. 12.

### H.      Desirability of Having Case Tried by Forum Familiar with Substantive Law

Defendant claims that venue would be more appropriate in Texas because Ms. Quiñonez's FTCA claims involve issues of Texas tort law.  *See* ECF No. 20-1, p. 12.  However, this Court would have no trouble readily applying basic Texas tort law.  Ms. Quiñonez's FTCA claims for negligence, negligent supervision, and intentional infliction of emotional distress involve rather simple Texas tort law issues. *See Merkur,* 2001 WL 477268 at *5 ("[W]here an

18

action does not involve complex questions of another state's laws, courts in this district accord little weight to this factor on a motion to transfer."); *Hawley v. Accor North Amer., Inc.*, 552 F. Supp. 2d 256, 261 (D. Conn. 2008) (personal injury cases are generally not complex and court in Connecticut is familiar enough with general personal injury law to apply Arizona law).  Where the action involves a relatively simple case, "the fact that a New York court would apply [Texas] law is of little consequence in the determination of this motion."  *Schwartz v. Marriott Hotel Services, Inc.*, 186 F.Supp.2d 245, 247 (E.D.N.Y. 2002) (quoting *Dwyer v. General Motors Corp.,* 853 F. Supp. 690, 695 (S.D.N.Y. 1994)).

Moreover, all of the legal questions regarding Ms. Quiñonez's *Bivens* claims for violations of her Fifth Amendment rights are matters of federal law.  *See Carlson*, *v. Green*, 446 U.S. 14, 23 (1980) ("*Bivens* actions are a creation of federal law, and, therefore" an issue regarding a *Bivens* action "is a question of federal law.")  This Court is situated just as well as any other federal district court to adjudicate Ms. Quiñonez's claims arising under the United States Constitution.  *See Wilson v. DirectBuy*, *Inc.*, 821 F. Supp. 2d 510, 519 (D. Conn. 2011) ("Federal courts are presumed to be equally familiar with federal law.").

## I.     Practical Difficulties and the Interests of Justice

 Transferring this case to Texas would impose severe practical difficulties on Ms. Quiñonez and would certainly not serve the interests of justice.  As already explained, Ms. Quiñonez suffers from a multitude of psychological and physical health problems, including anxiety, depression, diabetes, migraines, and severe hypertension.  Additionally, she is currently four months pregnant and her pregnancy is considered "high risk" due to her complicated health problems.  In a matter of months, Ms. Quiñonez will be responsible for the care of a newborn baby.  She is also unemployed and relies on her relatives for financial support. Forcing her to

litigate this case over one thousand miles away from where she lives would impose a severe strain on her mental and physical health. On the other hand, Defendant can easily litigate this case in New York.

Defendant asserts that litigating this case in Texas would serve the public interest because immigration detention conditions in Texas are an issue of local concern. *See* ECF No. 20-1, pp. 12-13. To the contrary, the way in which the Government treats newly arrived aliens to this country, no matter their immigration status, is an issue of *national* concern. Ms. Quiñonez, and the people with whom she was detained, were deprived of their basic human needs and subjected to grossly inhumane treatment, in violation of official guidelines intended to protect them from abuse. Such violations of the respect for human dignity committed by the Government or those it employs is not a concern localized to any one part of this country. Rather, it is an issue of nationwide concern because such inhumane and degrading actions breach important values that help define our nation.

## CONCLUSION

For the foregoing reasons, Ms. Quiñonez respectfully requests that the Court deny Defendant's Motion to Change Venue and retain jurisdiction over this case.

Dated: January 13, 2015

Respectfully submitted,

/s/ Ira J. Kurzban
Ira J. Kurzban (*pro hac vice*)
Kurzban, Kurzban, Weinger
Tetzeli & Pratt, P.A.
2650 S.W. 27th Ave.
Second Floor
Miami, Florida 33133
Phone: (305) 444-0060
Fax:   (305) 444-3503

Email: ira@kkwtlaw.com


/s/ Jennie Santos-Bourne
Jennie Santos-Bourne (*pro hac vice*)
Americans for Immigrant Justice
3000 Biscayne Blvd.
Suite 400
Miami, Florida 33137
Phone: (305) 573-1106
Fax:     (305) 576-6273
Email: jsantos@aijustice.org

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on January 13, 2015, I filed the foregoing document and all attached

exhibits with the Clerk of Court, using the CM/ECF system, which will send a notification of

such filing to the following:

> Margaret M. Kolbe
> Assistant U.S. Attorney
> United States Attorney's Office
> 271 Cadman Plaza East, 7th Floor
> Brooklyn, New York 11201
> Margaret.Kolbe2@usdoj.gov

And I hereby certify that I mailed the foregoing document by U.S. Mail to the following non-

filing user:

> None

/s/Ira J. Kurzban
Ira J. Kurzban

22