UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------x
ALBA QUIÑONEZ FLORES,

                Plaintiff,            PLAINTIFF'S POST-HEARING
                                      SUPPLEMENTAL BRIEF IN
   v.                                     OPPOSITION TO DEFENDANT'S
                                      MOTION TO CHANGE VENUE
UNITED STATES OF AMERICA;
DOES 1-10,                            Civil Action No. 14-CV-3166 (JBW) (RML)

                Defendants.
---------------------------------------------------------x

Plaintiff Alba Quiñonez Flores ("Ms. Quiñonez" or "Plaintiff") hereby files her Post-Hearing Supplemental Brief in Opposition to Defendant's Motion to Change Venue pursuant to the Court's September 29 oral order. Plaintiff has brought this action against the United States of America ("Defendant") pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b). Plaintiff's claims are based on the mistreatment she suffered while in immigration detention in Texas. *See* Second Amended Complaint, ECF No. 12, pp. 6-14. Specifically, Plaintiff has sued the United States for negligence, negligent supervision and training, and intentional infliction of emotional distress. *See id.* at 14-19.

## INTRODUCTION

This Court held a hearing on September 29 on Defendant's Motion to Change Venue during which the Court observed that based on the amount of progress that has been made in this case, it would be undesirable to transfer the case to another judge in Texas. Based on a previous decision from the Court in another case, the Court indicated that it would be willing to travel to Texas for the limited purpose of taking the testimony of witnesses who will be unavailable to

1

testify in person at trial in New York. *See In re Application to Take Testimony in Criminal Case Outside District*, 102 F.R.D. 521 (E.D.N.Y. 1984) (Weinstein, C.J.). Although Plaintiff appreciates the Court's willingness to make such accommodations, she believes that there are superior alternatives to taking live testimony in Texas that will not put an unnecessary strain on judicial resources. There are currently at least six witnesses who will be testifying in person at trial in New York: Plaintiff, Plaintiff's two expert witnesses, Plaintiff's treating physician, and Defendant's two expert witnesses.

Additionally, Plaintiff has already conducted six videotaped depositions of CBP officers and supervisors from the Falfurrias Border Patrol Station ("Falfurrias Station") that can readily be admitted at trial in lieu of in person testimony if Defendant chooses not to produce these officers at trial. The only additional out of state witnesses that Defendant indicated it intended to obtain testimony from are an unspecified number (likely very few) of medical personnel who briefly treated Plaintiff while she was detained. If these witnesses are unwilling to travel to New York in order to testify, Defendant can compel them to sit for videotaped depositions that can be used at trial. Moreover, any out of state witnesses who are willing can testify remotely via contemporaneous videoconferencing. Thus, as explained below, there is no need for the Court to travel to Texas for the limited purpose of taking witness testimony given the availability of these other adequate means of presenting trial testimony.

## DISCUSSION

**I.      If a Witness Is Unable to Appear at Trial and His or Her Deposition Has Not Been Taken Before Trial, Trial Testimony May and Should Be Taken By Videoconferencing.**

Trial testimony may be taken by a witness appearing in the courtroom, through the admission of deposition testimony [Fed. R. Civ. P. 32(a)], or through video conferencing [Fed.

R. Civ. P. 43(a)]. Plaintiff believes that all three methods are acceptable in this case. In fact, many depositions of CBP officers have already been taken and those depositions were taken by video, thereby giving the Court the opportunity to observe the witness' demeanor as well as directly listening to their testimony. Deposition testimony and videoconferencing have consistently been contemplated as alternatives to live testimony at trial and their use here, coupled with those witnesses who can appear in person, would conserve judicial resources and obviate the need for the Court to travel to Texas.

Indeed, many witnesses in this case will be live, in person witnesses at trial including Plaintiff, Plaintiff's expert witnesses, Plaintiff's treating physician, and Defendants' expert witnesses. All of these witnesses would have to travel to Texas if a trial were held there. Little would be accomplished in the way of conserving resources as it would be more onerous to move the trial to Texas than to hold it in New York where all of these witnesses will be present. Additionally, at this point, videotaped depositions of six Border Patrol officers have already been taken. Although Defendant can compel these officers to appear in New York for trial as their employer, their videotaped depositions can also be admitted in lieu of live testimony. There is no question that videotaped deposition testimony of an unavailable witness may be easily used, and is routinely used, in federal trials. *See Barclay v. New York*, 602 F. App'x 7, 13 (2d Cir. 2015) ("[W]hen a witness's unavailability for trial is anticipated in advance, 'depositions, including video depositions, provide a superior means' of securing the witness's testimony for trial.") (quoting Rule 43 Advisory Committee Notes).

Besides the CBP officers, the only other out of state witnesses that Defendant has indicated it intends to take testimony from are a very limited number of medical personnel who briefly treated Plaintiff during her time in detention. Even though these medical personnel are

3

unlikely to have much useful information, if any, regarding Plaintiff's psychological condition or facts related to her three days in CBP custody, if Defendant truly believes their testimony is necessary it has three options. First, they can have those witnesses appear in New York. Second, if they are unwilling to appear in New York, Defendant can take their videotaped deposition testimony for admission at trial. Or third, their testimony can be taken remotely by contemporaneous videoconference. Although Defendant has not stated that any of these few remaining witnesses would be unwilling to travel to New York or testify by videoconference, Plaintiff has no objection to taking their videotaped depositions, which Defendant can compel, before trial and use them at trial.

Under Fed. R. Civ. P. 32(a), "all or part of a deposition may be used against a party" at a hearing or trial if (1) "the party was present or represented at the taking of the deposition or had reasonable notice of it"; (2) "it is used to the extent it would be admissible under the Federal Rules of Evidence if the deponent were testifying"; (3) other conditions provided by Rule 32 are met. The third prong is satisfied in this case because the only reason that unwilling out of state witnesses would be unavailable to testify in person at trial is because they reside over 100 miles from the Court. Rule 32(a)(4)(B) provides that a "party may use for any purpose the deposition of a witness, whether or not as party, if the court finds . . . that the witness is more than 100 miles from the place of hearing or trial . . . ." Notably, "[b]y its terms, the rule draws no distinction between depositions taken for purposes of discovery and those taken for use at trial." *Manley v. AmBase Corp.*, 337 F.3d 237, 247 (2d Cir. 2003). And the fact that counsel for Defendant did not ask any questions during the depositions of CBP officers has no bearing on the admissibility of those depositions in lieu of in person testimony. *See also United States v. IBM*, 90 F.R.D. 377, 381 (S.D.N.Y. 1981) ("Rule 32 does not evince a distinction as to admissibility at trial between a

4

deposition taken solely for the purposes of discovery and one taken for use at trial . . . . Likewise, any decision by [a party] to limit its questioning during depositions is not a bar to admission of" depositions under the Rule.).

Videotaped depositions of any witnesses in Texas or elsewhere over 100 miles from the Court who are unwilling to travel to New York provide a perfectly sufficient substitute for live testimony, as has been recognized by various courts around the country:

> [V]ideotaped depositions are a necessary and time effective method of preserving witnesses' time and allocating precious court and judicial time in this age of advance court technology and over-crowded court calendars. [Thus, w]e must not seem reluctant to adopt any and all time-saving methods that serve to improve our system of justice.

*Weber v. Fujifilm Medical Systems U.S.A., Inc.*, No. 10-cv-401, 2015 WL 4774466, at *5 (D. Conn. Aug. 13, 2015) (quoting *Commercial Credit Equip. Corp. v. Stamps*, 920 F.2d 1361, 1368 (7th Cir. 1990)).  *See also Duncan v. IBM*, No. 95-cv-1785, 1996 WL 720106, at *4 (S.D.N.Y. Dec. 13, 1996) ("[T]he federal courts have shown consistent sensitivity to evolving technology that may facilitate efficient litigation practices . . . . Present videotaping techniques can provide jurors high-quality pictures and sound, and thus go far to replicating the experience of viewing a witness live in the courtroom."); *Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Americas*, 262 F.R.D. 293, 301 (S.D.N.Y. 2009) (where witnesses were not subject to subpoenas under Rule 45, videotaped deposition testimony was admissible at trial); *Weiss v. Wayes*, 132 F.R.D. 152, 155 (M.D. Pa. 1990) ("The use of videotaped testimony should be encouraged and not impeded because it permits the jury to make credibility evaluations not available to it when a transcript is read by another.").  Moreover, any concern regarding presenting deposition testimony to a jury is negated in this case where the Court will be the factfinder at trial.

In addition to using video depositions of any unavailable out of state witnesses for trial testimony, the Court can also take testimony by contemporaneous videoconference during trial for any willing witnesses. Rule 43(a) allows the Court to "permit testimony [at trial] in open court by contemporaneous transmission from a different location" for "good cause in compelling circumstances and with appropriate safeguards." "[F]ederal trial courts have repeatedly, in civil cases, taken testimony by telephone and closed circuit television. The jury has never had any difficulty in evaluating such testimony." *United States v. Gigante*, 971 F. Supp. 755, 758 (E.D.N.Y. 1997) (Weinstein, J). In *FTC v. Swedish Match North Amer., Inc.*, the court found that the inconvenience of a witness travelling from Oklahoma to Washington, D.C. constituted the necessary good cause to take testimony via contemporaneous videoconference, rather than in person. 197 F.R.D. 1, 2 (D.D.C. 2000). The court explained that video transmission of the witness's testimony provided adequate safeguards and would not prejudice the defendants because the witness would still be testifying in open court, under oath, and with the opportunity for cross-examination. *Id.* Finding that "there is no practical difference between live testimony and contemporaneous video transmission," the court correctly concluded that "[t]o prefer live [in person] testimony over contemporaneous video transmission is to prefer irrationally one means of securing the witness's testimony which is exactly the same." *Id. See also Sallenger v. City of Springfield*, No. 03-cv-3093, 2008 WL 2705442, at *1 (C.D. Ill. July 9, 2008) ("Video conferencing allows the jury to view the witness as he testifies, and thus, it satisfies many of the goals of in-person testimony . . . .").

Additionally, the Court would be within its discretion to conduct the entire trial by videoconference if it so desired. *See Edwards v. Logan*, 38 F. Supp. 2d 463, 465 (W.D. Va. 1999) ("The federal rules allow the use of video conferencing or comparable technology to

6

present witness testimony, but do not expressly permit or restrict a court's ability to conduct an entire civil trial through video conferencing."). However, this will not be necessary in this case considering that many witnesses will be testifying in person in New York and most of the potentially unavailable witnesses in Texas have already had their videotaped depositions taken. And any of the few potential witnesses who are unwilling to testify live via videoconference can be compelled to appear for videotaped depositions.

Thus, because of the availability of videotaped depositions and the option to take live testimony via videoconference, it is unnecessary for the Court to travel all the way to Texas to take trial testimony. Admission of video depositions or taking testimony by videoconference are both acceptable alternatives to appearing in Texas for a few of the witnesses, as other witnesses would have to travel to Texas for the trial. The Court will be able to observe and hear witnesses just as easily as if they were testifying in the courtroom and neither party would be prejudiced by either means. Furthermore, any concerns that a jury would not be able to adequately assess the veracity of witnesses not testifying in person do not apply here, as this is a bench trial and the Court would obviously not be hampered in its fact-finding ability. There is accordingly no risk of confusion on the part of the factfinder here, as the Court will be able to readily assess the demeanor and credibility of witnesses who are unavailable to testify in person. *Cf. Commonwealth Edison Co. v. Allis-Chalmers Mfg. Co.*, 40 F.R.D. 96, 101 (N.D. Ill. 1966) ("[T]he rules of admissibility should not be applied [in a bench trial] with the same strictness as when a jury is present. It is presumed that the trial court will not be influenced by the receipt of inadmissible evidence as will a jury.").

Finally, Plaintiff understands that the Court may want to examine the Falfurrias Station in person. However, the video of the inspection conducted by Plaintiff's counsel is a full and

accurate depiction of all of the areas of the facility relevant to this case. The court will also be assisted by Plaintiff's expert witness, Eldon Vail, who will provide the details regarding the inadequacies of the facility. Plaintiff submits that there would be very little more to gain from an in person visit and believes that it is unnecessary for the Court to expend valuable judicial resources in travelling to Texas. This especially true considering that Defendant has already conceded many deficiencies at the facility with which the Court is concerned, as explained further below.

## II.    Conditions and Practices at the Falfurrias Border Patrol Station.

During the September 29 hearing, the Court asked Defendant a series of questions regarding conditions and practices at the Falfurrias Station. Plaintiff addresses those questions here.

**Time Period When Facility Was Built**

Plaintiff has no knowledge regarding the time period when the Falfurrias Station was constructed.

**Entity That Paid for the Construction of the Facility**

Plaintiff does not know who paid for the construction of the Falfurrias Station, but believes that the construction was funded by the United States Government.

**Detainee Holding Capacity**

When the Court repeatedly asked Defendant how many detainees the Falfurrias Station was designed to hold, Defendant was unable to provide an answer. Instead, Defendant evasively referenced design standards for the building and stated that Defendant would have to go back and calculate the total capacity based on the design standards. One would naturally assume that after litigating this case for a year and a half, Defendant would know how many people are

8

allowed to be detained at the facility. However, the reason Defendant was unable to provide the Court with a straightforward response to this simple question is that there is no official detainee capacity limit at the facility—no one at the Falfurrias Station has established or enforces a maximum hold room capacity for detainees. This is despite the fact that CBP's Hold Room Policy specifically mandates that "Detention space capacity will not be exceeded." ECF No. 12-1, p. 13. This policy mandate is completely meaningless and futile if everyone at the Falfurrias Station is too negligent to even bother establishing a maximum capacity.

Plaintiff testified that only 10 to 15 people *sitting down* (not sleeping) would fit into the holding cell where she was detained, but on average there were 15 to 20 people in her cell, making the cell grossly overcrowded for people kept overnight. *See* ECF No. 60, Ex. A, pp. 212-213; Comp. ¶18. Not a single line officer or supervisor is able to articulate whether that capacity is appropriate. For instance, line officer Allen Foster is completely unaware of what the maximum detainee capacity at Falfurrias is, and only assumes that there must be one. *See* ECF No. 60, Ex. B, p. 49. More troubling, Deputy Patrol Agent In Charge ("PAIC") Thomas Slowinski, the second most senior agent at Falfurrias, also does not know or have any estimate as to what the maximum capacity is for detainee holding rooms. *See* ECF No 60, Ex. C, pp. 28-32. Watch Commander Doncio Diaz stated that he did not know if there was a maximum capacity for individual holding cells at the facility or if the capacity was posted anywhere. *See* ECF No. 79, Ex. A, pp. 30-31. While Watch Commander Joseph Cabral stated that he is sure there is a maximum capacity for each holding cell, he does not know what it is or whether it is posted anywhere. *See* ECF No. 79, Ex. B, p. 51. Mr. Cabral also stated that he has seen more than 20 people held in one of the cells in which Plaintiff was detained. *Id.* at 53. Watch Commander Anselmo Garcia also has no idea if the holding cells have a maximum capacity or whether the

capacity is posted anywhere, but stated that he has seen more than 25 people held in cells at the facility.  *See* ECF No. 79, Ex. D, pp. 25-27.

According to Plaintiff's expert Eldon Vail, the former Secretary of the Washington Department of Corrections, "there is not enough room for 20 people to be able to sleep in the cell.  It would be a challenge for all of them to even find a place to sit on the concrete benches."  ECF No. 79, Ex. E, p. 9.  And based on there only being a single toilet in each cell, "there should have been no more than 8 women detained in cells where" Plaintiff was held.  *Id.* at 9.  Thus, even if there was an established hold room capacity at the Falfurrias Station, the amount of people actually held there was not in accordance with appropriate standards.

**Showers**

Plaintiff agrees with Defendant that showers are not made available to detainees at the facility.  This is despite that fact that the Hold Room Policy requires officers to make "reasonable efforts to provide a shower for any detainee held for more than 72 hours."  *See* ECF 12-1, p. 9.  Plaintiff was in CBP custody for 75 hours and was never provided an opportunity to shower.  Mr. Vail notes that "[a]lthough Ms. Quiñonez was detained for by CBP for 75 hours, CBP officials never once provided her with a shower or hygiene supplies, in violation of widely recognized standards and in the case of a shower, their own internal policy.  Their supervisors failed to make sure their subordinate employees followed their internal policy."  ECF No. 79, Ex. E at 11.

**Bedding**

Plaintiff agrees with Defendant that no mattresses or anything resembling a bed are available for detainees at the Falfurrias Station.  However, paragraph 6.11 of the Hold Room Policy clearly states that "Detainees requiring bedding will be given clean bedding."  ECF 12-1,

10

p. 8. Bedding, by that definition, is never provided to any detainees at Falfurrias and there is no standard by which agents determine if a detainee requires bedding. Deputy PAIC Slowinski justified the lack of bedding by pointing out that Falfurrias is "not a long term facility," even though he admits it is possible for someone to be detained there for two weeks and knows of detention periods lasting up to a week. *See* ECF No. 60, Ex. C, pp. 79, 42. According to Deputy PAIC Slowinski, at most, CBP agents provide detainees with only a blanket. *See id.* at 81. Other officers also confirm that detainees are not provided with a mattress or pillows. *See* ECF No. 60, Ex. B, p. 42; ECF No. 79, Ex. A, p. 61; Ex. D, p. 53. Such a blanket was never provided to Plaintiff by any officer and she was only able to acquire one left behind by another detainee on the last night of her detention at Falfurrias Station. *See* ECF No. 60, Ex. A, p. 210. Due to the absence of bedding at Falfurrias, Plaintiff was forced to sleep on the concrete floor the entire three day period she was detained at the Falfurrias facility, despite the fact that she should have been provided bedding pursuant to CBP policy. *Id.* at 214.

Mr. Vail is highly critical of the lack of bedding provided to Plaintiff while she was detained by CBP. He points out that even though Hold Room Policy states that detainees who require bedding will be given clean bedding, "apparently detainees never meet the threshold of 'requiring bedding.' " ECF No. 79, Ex. E, p. 12. According to Mr. Vail, such "a practice is unthinkable in this country for convicted felons in prison or in a jail for inmates on pre- or post-conviction status." *Id.* at 13. Mr. Vail also states that the lack of bedding provided to detainees at Falfurrias Station is directly attributable to the facility's supervisory personnel. *Id.*

**Amount of Time Plaintiff Spent at the Facility**

During the hearing, Defendant attempted to separate the different aspects of Plaintiff's 75 hours in CBP custody in order to obscure the fact that Plaintiff spent 3 nights in a row sleeping

11

on a concrete floor. However, the Court pointed out that Plaintiff *did* and was forced to sleep at the facility without any bedding for three nights in a row.

**Store**

      Plaintiff agrees with Defendant that there is no store or commissary at the facility.

**Law Library**

      Plaintiff agrees with Defendant that there is no law library at the facility.

**Telephone Access**

      Although Defendant stated during the hearing that telephone access is available at the facility to contact family and detainees' consulates, Plaintiff was never provided an opportunity to use a telephone.

**Food Menu**

      Plaintiff agrees with Defendant that the only food items served to adult detainees are bologna sandwiches.

**Water Supply**

      Plaintiff agrees with Defendant that water is supplied to detainees in their cells. However, Plaintiff maintains that the water supply provided to her cell was not re-filled enough to provide an adequate supply, smelled like bleach, had a foul taste, and burnt Plaintiff's throat. *See* Compl., ECF No. 12 at ¶ 26.

**Air Conditioning**

      Plaintiff agrees with Defendant that there is air conditioning for the holding cells.

**Visiting Hours**

      Plaintiff agrees with Defendant that there are no visiting hours for detainees at the facility.

**Clothing**

Plaintiff agrees with Defendant that detainees are not issued any clothing and must wear whatever they are already wearing when they arrive at the facility.

**Temperature**

Defendant asserted at the hearing that the temperature of cells at the facility is maintained at between 68 and 75 degrees Fahrenheit. Plaintiff maintains that during her time detained at Falfurrias Station the temperature was so cold that her fingers turned blue, her lips split, and she constantly shivered. *See* Compl., ECF No. 12 at ¶ 20.

**Officer Training and Education**

Training and education of officers at the Falfurrias Station related to the treatment of detainees is severely lacking. The CBP Hold Room and Short Term Custody policy is the only document that regulates CBP officers' treatment of detainees at Falfurrias Station. Even though this is the only written policy governing detainee treatment and even though it is only 14 pages long, no one who was stationed at the facility in February 2013 seems to have any firm grasp of the document's contents. This is because CBP supervisors do not adequately train and supervise their subordinates in the implementation of the Hold Room Policy. Except for during the days immediately prior to their depositions, neither line officer Foster nor Quezada could remember the last time they actually read the Hold Room Policy or if they have received any specific training in implementing the policy. *See* ECF No. 60, Ex. B, pp. 97-98; ECF No. 79, Ex. C, pp. 34-35, 37. Mr. Quezada does, however, readily remember that he received firearms and use of force training a month and a half before his deposition and that he receives that training quarterly every year. ECF No. 79, Ex. C. at 37-38.

CBP line officers' lack of knowledge regarding the Hold Room Policy is a direct consequence of their supervisors' complete lack of action to implement the policy. Deputy PAIC Slowinski, the second in command at Falfurrias, stated that while agents are required to be familiar with the Hold Room Policy, he has no idea whether agents are provided a copy, when or how training related to the Hold Room Policy is conducted, or whether there is any sort of examination or other procedure to ensure that agents are familiar with and understand the policy. *See* ECF No. 60, Ex. C, pp. 58-61. Watch Commander Diaz has never received any formal training in implementing the Hold Room Policy and has not actually read the entire document since it was issued in 2008. *See* ECF No. 79, Ex. C at 25-27. Watch Commander Cabral also does not recall receiving any specific training relating to the Hold Room Policy. *See* ECF No. 79, Ex. B at 42. Although Mr. Cabral stated that facets of the policy are sometimes covered during muster, there is no test, evaluation, or other independent way of verifying the line officers have read or understand Hold Room Policy. *Id.* at 43-44. Likewise, Watch Commander Garcia confirmed that he has never taken any class regarding the Hold Room Policy or conducted any training of his subordinates regarding implementation of the policy. *See* ECF No. 79, Ex. D at 19-20. However, similarly to Mr. Quezada, all three of these Watch Commanders easily recall how often they receive firearms and use of force training. *See* ECF No. 79, Ex. A, p. 27; Ex. B, pp. 42-43; Ex. D, p. 20.

Mr. Vail expressed astonishment at the lack of training related to the treatment of detainees at Falfurrias Station. To him, the "fact that the CBP has only one [policy] is shocking. Even more shocking is that lack of formal training regarding the policy." ECF No. 79, Ex. E, p. 19. Mr. Vail points out that the second-in-command's expressed lack of knowledge regarding his subordinates' training in the Hold Room Policy is "a statement of profound ignorance or

14

indifference." *Id.* After noting how little knowledge the line officers and supervisors have regarding training in the Hold Room Policy as compared to firearms and other training, Mr. Vail concludes that such a "dramatic contrast is clear illustration that the training, supervision and accountability for the treatment of detainees are deplorable." *Id.* at 20. For Mr. Vail, who has over 35 years of experience in corrections, the "lack of adequate training for Patrol Agents is deeply disturbing." *Id.* at 21. This lack of training in the proper treatment of detainees is a direct cause of the mistreatment suffered by Plaintiff during her time in CBP custody.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court maintain jurisdiction over this case, deny Defendant's Motion to Change Venue Pursuant to 28 U.S.C. § 1404(a), and allow for the admission of videotaped depositions or taking of testimony via videoconference for any of the few out of state witnesses who cannot appear in New York.

Dated: October 20, 2015

                                                Respectfully submitted,

                                                /s/ Ira J. Kurzban
                                                Ira J. Kurzban (*pro hac vice*)
                                                Kurzban, Kurzban, Weinger
                                                Tetzeli & Pratt, P.A.
                                                2650 S.W. 27th Ave.
                                                Second Floor
                                                Miami, Florida 33133
                                                Phone: (305) 444-0060
                                                Fax:   (305) 444-3503
                                                Email: ira@kkwtlaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on October 20, 2015, I filed the foregoing document using the CM/ECF system, which will send a notification of such filing to the following:

    Margaret M. Kolbe
    Assistant U.S. Attorney
    United States Attorney's Office
    271 Cadman Plaza East, 7th Floor
    Brooklyn, New York 11201
    Margaret.Kolbe2@usdoj.gov

And I hereby certify that I mailed the foregoing document by U.S. Mail to the following non-filing user:

    None

    /s/Ira J. Kurzban
    Ira J. Kurzban